IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
October 3, 2023 Session

## STATE OF TENNESSEE v. TONY MARKEE MOSLEY

**Appeal from the Circuit Court for Obion County
No. CC-19-CR-132 Jeff Parham, Judge**

_____

**No. W2022-01424-CCA-R3-CD**

_____

An Obion County jury convicted the Appellant of second degree murder of Decora Alexander, for which he received a sentence of twenty-five years' confinement. At the time of the offense, the Appellant was serving a four-year probation sentence for an offense involving the same victim, which was subsequently violated and ordered to be served consecutively, for an effective sentence of twenty-nine years' confinement. The Appellant argues on appeal: (1) the trial court erred in denying the Appellant's motion to dismiss for lack of a speedy trial; (2) the evidence was insufficient to support his conviction; (3) the trial court erred in not charging the jury with self-defense; (4) the trial court erred in allowing the testimony of the Appellant's probation officer at trial; (5) the trial court erred in admitting photographs from the crime scene and a life-in-being photograph into evidence; (6) the trial court imposed an excessive sentence without consideration of the Appellant's mitigation proof; and (7) the trial court's cumulative errors necessitate a new trial.[1] Upon our review, we discern no reversible error and affirm the judgment of the trial court.[2]

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

CAMILLE R. MCMULLEN, P.J., delivered the opinion of the court, in which ROBERT H. MONTGOMERY, JR., and J. ROSS DYER, JJ., joined.

Joseph Atnip, District Public Defender, and Brennan M. Wingerter (on appeal), Assistant District Public Defender, for the appellant, Tony Markee Mosley.

_____

[1] Although the Appellant contends his sentence is excessive, his violation of probation is not the subject of this appeal.

[2] We have reordered the Appellant's issues for clarity.

Jonathan Skrmetti, Attorney General and Reporter; Brent C. Cherry, Senior Assistant Attorney General; and Thomas Thomas, District Attorney General, for the appellee, State of Tennessee.

## OPINION

On May 11, 2019, the Appellant stabbed and killed Decora Alexander, the victim, at the Appelant's home. After receiving calls of a disturbance, an officer attempted to force open the bolted front door of the home. The Appellant exited covered in blood with his throat cut and told the police, "She's dead; I killed her." The lifeless body of the victim was found inside the Appellant's bedroom. After being treated for his injuries, the Appellant was arrested fifteen days later. In October 2019, he was indicted for first degree murder and mistreatment of a corpse and was convicted of the lesser-included offense of second degree murder.

**Pretrial Delay**. Because the Appellant alleges he was denied his right to a speedy trial, we outline below the pretrial proceedings relevant to his claim, including motions related to electronic files the Appellant correctly believed the State had not provided him in discovery, defense motions for continuances, and the death of the Appellant's retained counsel.

The Appellant was appointed his first counsel shortly after his arrest. On February 5, 2020, the trial court ordered the State to return cash taken from the Appellant's home to the Appellant. As a result, the Appellant was no longer considered indigent and the court ordered the Appellant to retain private counsel. On February 18, 2020, retained counsel filed a notice of appearance. The Appellant's trial was initially scheduled to begin May 17, 2021.

While represented by retained counsel, the Appellant filed a pro se discovery request on June 4, 2020. Around eight months later on February 1, 2021, the Appellant filed a pro se motion for sanctions for failure to comply with the discovery request. He alleged that the State had not allowed him to copy or inspect "electronics and electronic storage devices" that were "likely instrumental in preparing a defense[.]" The trial court held a hearing on the motion on March 1, 2021. The Appellant testified that the State had "disks," body camera footage, and lab results he had not been allowed to copy or inspect. The State said they had provided all of the evidence they intended to use at trial. The trial court denied the motion for sanctions stating, "So . . . the district attorney says they've given everything back. [The Appellant] is really not able to say that they haven't."

On May 3, 2021, two weeks before the scheduled trial, retained counsel requested a continuance because "[t]here [was] still discovery coming in" and there was "other

discovery that [the Appellant] was requesting" from retained counsel. The trial court granted the continuance and scheduled the trial for September 20, 2021.

On June 15, 2021, the Appellant filed a second pro se discovery request. The State filed a response on July 27, 2021, stating that "the State repeats what it has reported to the [c]ourt on numerous occasions during the course of this matter: the State, through counsel for the defense, has presented [the Appellant] with all physical evidence in its possession[.]" The trial court held a hearing the same day. Retained counsel stated that "[the Appellant] does not believe that the State has provided him with everything" and requested that the trial court order that the Appellant's discovery be transported to the facility he was housed in. At the hearing, the Appellant testified, "I'm just trying to see why some of this took so long. It's just been sitting and waiting. . . . I don't know why I got to jump through hoops to see evidence." After the hearing, the State filed a supplemental response, indicating that it was releasing to the Defendant all remaining electronic property seized. Attached to the supplemental response was a Tennessee Bureau of Investigation (TBI) report that described all of the items submitted to its Technical Services Unit. The trial court entered an order on August 16, 2021, which stated in part:

> The [c]ourt [] finds that the District Attorney's office has stipulated that they have provided all discovery material to the Defendant through his attorney, however, if any further discovery material arises, it will be immediately provided to the Defendant.

> To the extent that the [c]ourt may order the Tennessee Department of Correction[] to provide an opportunity to the Defendant to review electronic discovery, it is so ordered.

On September 2, 2021, eighteen days before the scheduled trial, retained counsel filed a second motion for continuance stating that he was "unable to adequately review electronic discovery recently submitted in this matter and, therefore, cannot be adequately [] prepared for the trial[.]" The trial court held a hearing on September 7, 2021.[3] On September 15, 2021, the trial court granted the motion and rescheduled the trial for December 6, 2021.

On November 27, 2021, nine days before the scheduled trial, retained counsel died. A hearing was held on December 3, 2021.[4] On December 9, 2021, the trial court issued an order substituting counsel and granting the Appellant's request to proceed pro se. The

---

[3] The record does not contain a transcript of the hearing on the Appellant's second motion for continuance.

[4] The record does not contain a transcript of the hearing on the substitution of counsel.

court found that the Appellant was indigent and appointed the public defender's office as "elbow counsel."

On December 20, 2021, the Appellant made an oral motion to dismiss the charges, alleging that he was denied his right to a speedy trial.[5] The trial court issued an order denying the motion, finding that COVID-19 prevented jury trials, that the court granted two defense motions to continue, and that retained counsel died. The trial court rescheduled the trial for March 28, 2022.

On December 30, 2021, the Appellant filed a motion entitled "Ex-Parte Motion to Regulate Discovery." The Appellant requested that he be permitted to "copy all electronics in the State's possession" because the copies provided in discovery did not contain everything from the original electronic devices. He said the State did not copy any files of the file type "AVCHD," and that those files would provide "circumstantial evidence" that he "did not premeditate a killing" and would show that the victim willingly engaged in sexual acts with him while she had an order of protection against him. The court held a hearing on the motion on January 19, 2022, during which TBI Agent Derek Miller testified that all of the data from the original devices was transferred to the copy given to the Appellant. The hearing was continued to February 8, 2022. Agent Miller testified that since the last hearing date, he had found six videos from the day of the offense that had not been copied originally. He explained that the AVCHD referenced by the Appellant was "a technology that Sony uses to record its videos" and "[t]he actual file type is MTS." The AXIOM software that Agent Miller used to look through the electronic data did not look for MTS files. Agent Miller found the six MTS video files on an SD card from the Appellant's Sony camera, and intended to go through the remaining devices to look for MTS files. At the conclusion of the hearing, the trial court acknowledged that there were "some issues" with the discovery provided to the Appellant, but the court was "not sure [it was] anybody's fault." The court granted the Appellant funds to hire a forensic examiner to help him look through the electronic data.

On March 7, 2022, the Appellant filed a second motion to dismiss alleging that he was denied his right to a speedy trial. The State filed a response, and the trial court held a hearing on March 15, 2022. The Appellant testified that the reason for the delay was the State's withholding of evidence and explained the anxiety and concern he suffered knowing that the State had not given him all of the evidence. After hearing the testimony, the trial court denied the motion to dismiss. The court found COVID-19 and the defense requests for continuances caused the three-year delay. The court noted that though "[they] all were confused as to the issue of electronic discovery," nothing that happened "was intentionally done by the State [] to gain a tactical advantage over [the Appellant]." The

---

[5] The record does not contain a transcript of the oral motion to dismiss.

court also found that the Appellant had not asserted his right to a speedy trial and had not been prejudiced by the delay. At the conclusion of the hearing, the Appellant alleged that his forensic examiner had not yet received the electronic data and requested a continuance. The trial court granted his request and rescheduled the trial for May 23, 2021. On May 16, 2022, the Appellant expressed that he no longer wished to represent himself, and the trial court appointed counsel to represent him.

**Jury Trial**. The Appellant's two-day jury trial began on May 23, 2022. Six witnesses testified for the State. Three witnesses testified for the Appellant, and the Appellant testified in his defense.

Latoya Morris, a family friend and former coworker of the victim, testified.[6] Morris identified a picture of the victim, a life-in-being photograph wherein the victim was dressed in her University of Tennessee at Martin cheerleading uniform as a "pom pom girl[.]" The photograph was admitted over objection by the defense. Morris had known the victim for about five years and described the victim as "[s]weet, fun, silly, [and] bubbly." Shortly before the victim's death, the victim had been planning to transfer to Middle Tennessee State University. Documentation of her February 29, 2019 acceptance letter was entered into evidence.

Victoria Matheny, a friend of the victim, testified that she dropped the victim off at the Appellant's house around 11:00 a.m. on May 11, 2019, because the victim did not have a car. Matheny and the victim had initially planned for Matheny to pick up the victim after Matheny's shift at work ended, around 9:00 p.m. Matheny learned of the victim's death while still at work.

Kimberly Foley, the Appellant's former probation officer, testified to being at the Appellant's home on May 11, 2019. Foley and a fellow probation officer had arrived at the home late in the afternoon to conduct an initial home visit. Upon knocking at the door, the two officers heard a scream, shuffling, and noises of movement coming from inside the home. Foley believed these noises to be caused by children. A thud and silence followed. The two called out but received no response. They then called 911 for assistance with completing the home visit.

Foley's partner needed to return to their office, and the two left before law enforcement arrived. At the office, they received a phone call from law enforcement requesting their presence back at the home. They returned, and the deputies and probation officers knocked on the doors and windows of the home. They still received no response.

---

[6] Although there are references in the record to this witness by her maiden name, we will use the name referred to by the witness in her testimony.

The deputies and probation officers then left the scene. While conducting more home visits, Foley and her partner received a call to once again return to the home, and ambulances, cars, and officers were present in the yard. The probation officers gave law enforcement a statement.

Deputy Christopher Cummings testified that he was working as a deputy sheriff with the Obion County Sheriff's Department on May 11, 2019. He was called to a possible crime scene at the Appellant's home in Union City twice that day. The first time he arrived on scene, no one was present. He contacted dispatch to have the probation officers who had called 911 return to the home. A Google Maps photograph of the home and surrounding street was admitted into evidence.

The deputies and probation officers surrounded the residence and knocked on the windows and doors. They also listened for any noises within the home that would allow the deputies to force their way inside. Hearing no noises, the deputies and probation officers left the home at 6:23 p.m. At 6:36 p.m., multiple 911 calls were received about a disturbance at the residence, a possible break-in, and the sound of a gunshot. Deputy Cummings returned to the scene. Three of the Appellant's family members were in the front yard. One family member told Deputy Cummings that the sound of the reported gunshot had actually been the family members attempting to enter the home by breaking the glass of the front storm door.

Based on information given by the family members, Deputy Cummings attempted to force open the front door but heard someone on the other side "messing with the door lock." The door opened to reveal the Appellant covered "head to toe" in blood with his throat cut. The Appellant then "dropped" to Deputy Cummings' feet and said, "She's dead; I killed her. She's dead; I killed her." Deputy Cummings said that the Appellant then asked him to "[s]hoot him. Kill [him]."

Deputy Cory Pinion arrived on the scene, and Deputy Cummings advised him that the Appellant had been hurt. The Appellant made an unintelligible comment and attempted to re-enter the home, but he was stopped. The Appellant then "took both hands, four fingers in each hand, reached into his trachea, and he started pulling his trachea apart." He was then handcuffed. Deputy Tim Wright arrived and entered the house along with Deputy Cummings to determine whether anyone else was present inside the home. Upon entering the home, the deputies noticed that vases and other items had been knocked off of a table and shelf by the entrance. Blood was on the wall by the front door and bloody footprints led up to the door. Uncooked fish was found on the floor in the kitchen along with a cooking pan. Deputy Cummings followed the bloody footprints into the family room to find a sofa that had blood "all over it[,]" as well as a wall and corner of the room that was "covered in blood." The trail of footprints led Deputy Cummings to the Appellant's

bedroom where he discovered the body of the victim on the floor. Deputy Cummings exited and notified dispatch of an apparent homicide. A photograph of the victim's body on the floor of the Appellant's bedroom was admitted into evidence over objection by defense counsel.

On cross-examination, Deputy Cummings clarified that he did not know the Appellant's trachea had been "cut all the way through" until the Appellant had put his own fingers into the wound and pulled. Based on the Appellant's actions and statements, Deputy Cummings agreed that it seemed as if the Appellant wished to die in that moment. Deputy Cummings did not observe whether the Appellant had any other injuries.

Captain Scott Watkins testified that he was called to the crime scene and was advised that a male with a "slit throat" had been taken by ambulance to the hospital and that a deceased female was inside the house. Captain Watkins and Sheriff Carl Jackson contacted Investigator Derrick O'Dell with the Union City Police Department to photograph the scene. Eight crime scene photographs showing the victim's unbroken finger nails, her phone lying on the bedroom floor, a Sony camera on the bed, and various weapons lying around and under the victim's body were admitted into evidence over objection by defense counsel. The blood-stained surroundings of the bedroom were visible in the photographs, as well as parts of the victim's body.

Captain Watkins later interviewed the Appellant at the Obion County Jail and agreed that he read the Appellant his rights and that the Appellant "appeared to understand" his rights. When questioned, the Appellant said he could not remember what had happened to the victim. The only thing the Appellant said he remembered was that the victim had been holding an item in her hand which the Appellant described as a "little hook pick" about "two or three inches" in length. The Appellant believed the item was meant to clean fingernails, which made him "paranoid[.]" The victim appeared to be "hiding it around his bed, in the sheets, or something like that." An item matching this description was not found by law enforcement at the scene.

The Appellant said that the victim had come to his house that day to "do some work[]" making pornographic videos. The home the Appellant lived in belonged to his mother, though she was not present when the victim was killed. The Appellant did not remember whether he killed the victim, but he knew that "she was not alive anymore[,] and he didn't want to be alive anymore." A razor blade and three knives found around the victim's body were entered into evidence.

Doctor William Sago, a forensic pathologist, performed the autopsy of the victim. He testified that no drugs or alcohol were found in the victim's blood. He determined the cause of death to be from forty "multiple sharp force injuries." Wounds were found on the

victim's head, neck, torso, and extremities. Some wounds were consistent with defensive injuries and others were created by a blade with a serrated edge. This was consistent with one of the knives found near the victim's body. Two abrasions were also found on her lower lip. Doctor Sago stated that the number of injuries present, combined with their severity, required "repeated attempts" and were made "with intent" to cause the injuries.

Hope Huff, the Appellant's aunt, testified that she and the Appellant's mother visited the Appellant in the hospital following the victim's death. Initially, the Appellant "didn't really tell [them] anything," and asked if the victim was going to visit him in the hospital. However, on subsequent visits, Huff and the Appellant's mother explained to him what they knew regarding the victim's death. Huff said the Appellant "started crying" and saying he "didn't want to be here anymore."

Investigator Angie Taylor with the Obion County Sheriff's Department testified that she investigated the cell phones of the victim and the Appellant's mother. The last phone call made from the victim's phone was to the Appellant's mother at 6:19 p.m. and lasted one minute and nineteen seconds. Web searches "[w]here do you stab to die?" and "[h]ow can I stab myself to death quickly?" were made by the Appellant on the victim's phone at 6:30 p.m.

On May 12, 2019, a text from the Appellant's mother's phone was sent to a third phone at 6:37 p.m. saying that "[her] son had killed his girlfriend." The text was soon followed by another at 6:38 p.m. saying, "Sorry. Wrong person. But Tony killed his girlfriend and tried to kill hisself." On cross-examination, Investigator Taylor explained that the web searches were made on the night of the offense.

The Appellant, age thirty-four, testified that he and the victim had been "working" filming pornographic videos on May 11, 2019. He stated that he never planned to kill the victim and "never wanted to hurt her." He claimed his business with the victim was starting to become profitable, had generated $500 in three days, and was about to be "pretty big." He remembered attempting to commit suicide after killing the victim. A photograph of an injury to his torso was admitted into evidence. The Appellant did not recall his conversations in the hospital with his aunt and mother due to being "heavily sedated." He asserted that he had never searched ways to commit suicide prior to May 11, 2019.

On cross-examination, the Appellant stated that he and the victim were in the kitchen preparing to cook dinner when the victim told him that she was "going to cut [him]." She began to move toward a kitchen knife, and the Appellant "did [his] best" to step in front of her. The Appellant claimed he never picked up the knife and "did not recall" touching it. After moving in front of the victim, the Appellant said that he "pushed toward" the living room area while yelling "help" thinking that his mother was home. He

- 8 -

said he then pushed the victim back to the kitchen and let her go, after which she walked to the Appellant's bedroom.

A nightstand inside the Appellant's bedroom near the door had a "junk" drawer sitting on top of it. The Appellant explained that the drawer usually held three knives, hammers, and screwdrivers within it. The victim "went for what knives would be in there" and said "something to the effect" that she was going to "cut or stab" him. He stated that he tried to reach the victim before she could grab one of the knives and "was tussling." The Appellant did not remember grabbing the knife. He said he did remember causing "one wound" to the victim during their altercation as he was telling her to stop. The Appellant took his hands off of the knife after the victim was injured, and the victim released the knife. The knife fell to the ground, and the victim "went right back for it." The Appellant said he "just recall[ed] wanting to protect [himself] and not wanting to be cut and stabbed." The Appellant clarified that he had known his mother was out of town, but he had yelled to her for help since she was "always there." He then stated that he did not call for his mother specifically and that he had just been calling for help.

Although the Appellant claimed self-defense, he insisted that he "did not ever want to hurt [the victim] until [he] felt that . . . it wasn't nothing else [he] could do." He acknowledged that he said he did not recall what had happened during his interview with Captain Watkins. The Appellant claimed at trial that he still did not remember the events of the victim's death well and that he only remembered "pieces and bits." He recalled telling Captain Watkins about the nail pick he saw the victim holding the day of her death and clarified that it was earlier in the day before their confrontation in the kitchen when he saw her "fidgeting" with it. The Appellant claimed he watched the victim tuck the nail pick in the covers of the bed and took it from her, though he did not remember where he placed it.

The Appellant detailed an earlier argument he had with the victim that he believed might have led to their later confrontation in the kitchen. He told the victim earlier that day that he "didn't want to do the work anymore[,]" and the victim replied that she still wanted to have sex. The Appellant testified that the victim had recently begun to choke and scratch him during their videos, which he did not like and had told her as much during their argument. Because he felt she was "getting too difficult[,]" the Appellant told the victim that he did not want to film videos with her anymore. He believed they had reconciled from the argument by that evening.

The Appellant said the knife the victim reached for was a butcher knife among the dirty dishes in the sink. The Appellant explained, "I had moved a lot of the kitchen knives earlier because she looked at it[,] and I seen her . . . she looked at it, and I just . . . told her that she was trippin'[,] and I picked it up." He recalled seeing photographs of the house

- 9 -

taken after the victim's death that showed the other kitchen knives back in their place, but he did not recall placing them there. When asked why he did not tell officers in his statement about his self-defense claim, the Appellant said he was "kind of fearful speaking with them." The only thing the Appellant told the officers during his interview was that he was unsure whether the victim had gotten the knife because he knew she was attempting to reach it.

The Appellant denied saying anything about the victim "coming at [him] with a knife" on the night of her death and recalled only that she had a knife in her hand. He explained, "I was fighting. I . . . didn't want to be stabbed." The Appellant believed that it was his scream for help probation officer Foley heard during her first visit to the home. He testified that he only recalled wounding the victim once during the altercation and picking up the knife after it had fallen between them as he asked the victim to stop. He could not recall which blade he stabbed the victim with the first time but asserted that it had not been the butcher knife.

The Appellant also recalled his Google searches on the victim's phone, going to the front door as Deputy Cummings attempted to force it open, telling the officers to shoot him, claiming that the victim had made him do it and that she was dead, and waking up in the hospital.

In rebuttal, the State recalled Captain Watkins. He testified that the interview he conducted with the Appellant on May 26, 2019, lasted approximately forty minutes, and the Appellant did not mention what caused the incident, nor claim that the victim had attacked him first. The Appellant also never said he feared for his life because the victim was wielding a knife. During cross-examination, Captain Watkins clarified that the first interview had occurred at the hospital where the Appellant was advised of his rights and appeared to be coherent. The second and longer interview occurred at the sheriff's office, where the Appellant continued to insist that he could not remember anything about the offense. Instead, the Appellant "wanted [the officers] to tell him" what had happened.

In surrebuttal, the Appellant testified that he had been told by his family at the hospital that the sheriff's department had collected his laptop and cameras that had filmed the offense. The Appellant told the officers during his interview that he would review the footage with them for the purpose of refreshing his memory to answer their questions. He wanted to do this because he did not believe he started the incident. He asked the officers "what had happened" because he could not remember details of the offense.

The defense closed their proof, and the trial court concluded that the defense had not fairly raised the claim of self-defense. Citing State v. Benson, 600 S.W.3d 896 (Tenn. 2020), the trial court found that there was not a reasonable belief that the Appellant was in

imminent fear of death or serious bodily injury due to the victim's not definitively having had a knife.

Based on the above proof, the jury acquitted the Appellant on the charges of first degree murder and of abuse of a corpse. He was found guilty of the lesser included offense of second degree murder.

**Sentencing Hearing**. The trial court held a sentencing hearing on June 20, 2022. One witness testified for the State, and the Appellant was the sole witness for the defense. The presentence report showed that the Appellant had prior charges of bribery of a witness, violation of a restraining order, and possession of prohibited weapons. The Appellant was on probation at the time of the instant offense for bribery of a witness and violation of a restraining order, both against the victim. For those offenses, he had received a four-year sentence and was placed on judicial diversion. The Appellant also had convictions of owning prohibited weapons, violations of financial responsibility law, a violation of the seatbelt law, and three prior instances of speeding. At the time of the presentence report, a probation violation and two assault charges were pending.

On a personal questionnaire submitted May 9, 2019, the Appellant self-reported that he graduated from high school in 2006 and received an associate's degree from Mississippi State University. The Appellant reported that he was in "good and excellent" mental health and that he had never been enrolled in a treatment program. He did not list any information regarding prescription medications or any health issues or concerns. He also reported prior employment as a cashier for Save A Lot grocery store for three to four years and "Sports B-Manager" for two years. The only source of income the Appellant listed at the time of the report was "YouTube/online."

Leshia Taylor, the victim's older sister, testified as a representative for the victim's family. She stated that she would "never forgive" the Appellant for taking her only sister away from her. She felt that the Appellant held no remorse for his actions and stated that her feelings were shared by the rest of her family. Victim impact statements from the victim's family were entered into evidence.

Defense counsel submitted into evidence letters from individuals who could not attend the sentencing hearing, two of which were read aloud. Reading aloud a letter from Porshia Fair, a friend of the Appellant, defense counsel relayed that Fair trusted the Appellant on multiple occasions to babysit her children while she worked and "was always thoroughly pleased" by the way he cared for them. A letter from Shane Sisco stated that he knew the Appellant as a member of a basketball program from 2002 to 2006 and as an "extremely hard worker and tremendous teammate." He wrote, "This is not the young man

I knew during this time as a player in our basketball program." The remaining two letters testifying to the Appellant's good character were also entered into evidence.

The Appellant gave an allocution statement. He acknowledged the hurt that his mother was feeling because she had "cared about [the victim] deeply." He spoke to the victim's family regarding how he and the victim "almost brought her parents' grandkids into this world" and reminisced about babysitting the victim's nephew. The Appellant said he was "just deeply hurt," and that "not a day [went] by" that he did not "think about [the victim] and the good [sic] from [them]." He expressed remorse over starting his business with the victim and "put[ting] . . . thoughts of making money ahead of [his] conscience."

The Appellant described "times that he saved" the victim "from hurt and harm." He recounted once allegedly dissuading "an ex-friend" of the victim's from starting a fight with her when the victim was "lying on [the Appellant]." He also recounted an incident in the car where he claimed the victim "started throwing punches" at him from the passenger side. The Appellant said that he prevented her from leaving the moving car by having insisted earlier she put on her seat belt and grabbing at the seat belt as she attempted to jump out of the car.

Defense counsel submitted a statement of mitigating factors and requested the trial court consider factor (13), the consideration of any other factor consistent with the purposes of the Sentencing Act. Tenn. Code Ann. § 40-35-113. Defense counsel asked the trial court to consider the statement from Shane Sisco that the crime was "very much out of character for [the Appellant]."

After considering the above testimony, the trial court determined the Appellant was a Range 1 standard offender and imposed a sentence of twenty-five years at one hundred percent for the second degree murder conviction. The trial court also found that the Appellant violated his probation and revoked the Appellant's four-year sentence of diversion for bribery of a witness and violation of a restraining order. The trial court ordered the Appellant's second degree murder conviction to be served consecutively to his original four year sentence, for an effective sentence of twenty-nine years imprisonment. When determining the sentence, the trial court considered the evidence presented at trial and the sentencing hearing. It also considered the presentence report containing the victim impact statements as well as the principles of sentencing, the nature and characteristics of the criminal conduct, the evidence offered for enhancement and mitigating factors, and statistical information provided on sentencing practices for similar offenses. The trial court also considered the Appellant's statement and his potential for rehabilitation.

The trial court considered enhancement and mitigating factors and applied enhancement factors (1), (5), (9), and (13)(c). See Tenn. Code Ann. § 40-35-114. It

determined no mitigating factors applied.  When applying the enhancement factors, the trial court focused on the Appellant's previous charge against the victim, the "gruesome[]" injuries the victim sustained, and the four different weapons used during the killing.  The trial court also put little weight on the Appellant's apology and noted that he "again attempted to blame" the victim during his allocution statement.

The Appellant filed a motion for new trial and an amended motion for new trial, which were denied by written order.  This timely appeal followed.

## ANALYSIS

**I. Speedy Trial**.  The Appellant argues that the trial court erred in denying his motion to dismiss because he was denied his right to a speedy trial.  The State responds, and we agree, that the denial was proper.

Both the Sixth Amendment to the United States Constitution and Article I, Section 9 of the Tennessee Constitution guarantee an accused the right to a speedy trial.  This right is not implicated until the defendant is arrested or an indictment is issued.  State v. Simmons, 54 S.W.3d 755, 758-59 (Tenn. 2001).  The only possible remedy for a violation of a defendant's right to a speedy trial is dismissal of the charges against him.  Barker v. Wingo, 407 U.S. 514, 522 (1972).  When evaluating whether a defendant was denied his right to a speedy trial, courts should consider:  (1) the length of the delay; (2) the reason for the delay; (3) the defendant's assertion of the right; and (4) the prejudice suffered by the defendant from the delay.  Id. at 530; State v. Bishop, 493 S.W.2d 81, 83-85 (Tenn. 1973) (adopting the Barker test in Tennessee).

A speedy trial violation claim is a mixed question of law and fact.  State v. Moon, 644 S.W.3d 72, 78 (Tenn. 2022).  Appellate courts must "give deference to the trial court's findings of fact unless the evidence preponderates otherwise."  Id.  However, we review the trial court's interpretation and application of the law de novo.  Id.

**A. Length of Delay**.  "The length of the delay is to some extent a triggering mechanism."  Barker, 407 U.S. at 530.  Generally, a delay of one year or more will trigger a speedy trial inquiry.  State v. Utley, 956 S.W.2d 489, 494 (Tenn. 1997).  "The presumption that pre-trial delay has prejudiced the accused intensifies over time."  Id. (citing Doggett v. United States, 505 U.S. 647, 652 (1992)).

Here, the three-year delay is sufficient to trigger a speedy trial inquiry, but is not per se unreasonable.  See State v. Wood, 942 S.W.2d 342, 346-49 (Tenn. 1996) (delay of thirteen years did not violate right to speedy trial); Barker, 407 U.S. at 533-36 (delay of five years did not violate right to speedy trial).

- 13 -

**B. Reason for the Delay**. The reasons for delay generally fall within four categories: (1) intentional delay to gain a tactical advantage over the defense or to harass the defendant, which weighs heavily against the State; (2) bureaucratic indifference or negligence, including lack of due diligence, which weighs against the State; (3) delay necessary for the fair and effective prosecution of the case, which does not weigh against either party; and (4) delay caused, or acquiesced in, by the defense, which weighs against the defendant. Wood, 942 S.W.2d at 346-47; see also Barker, 407 U.S. at 531.

The Appellant acknowledges that the portion of the delay attributable to COVID-19 and the death of the Appellant's retained counsel does not weigh against either party. However, he contends that the remainder of the delay was caused by "the State's failure to timely and accurately mine the forensic digital data that [the Appellant] repeatedly requested in his discovery motions" and weighs against the State. The State responds that this factor weighs in its favor because the delays "were necessary to the fair and effective prosecution of the case and/or were caused by or acquiesced in, by the defense." We conclude that the reason for the delay weighs slightly against the Appellant because, though the majority of the delay was necessary for the fair and effective prosecution of the case, the remainder of the delay was caused by the Appellant's requests for continuances.

The Appellant's trial was initially scheduled for May 17, 2021, but did not begin until May 23, 2022. The record contains minimal explanation of the initial decision to schedule the trial two years after the Appellant's arrest. However, both times the trial court considered whether the Appellant had been denied his right to a speedy trial, the court noted that the delay was in part caused by COVID-19. We note that by orders of the Tennessee Supreme Court, jury trials were suspended from March 13, 2020 to July 3, 2020, and November 23, 2020 to March 31, 2021.[7] As this court has previously held, pandemic-related delays do not weigh against either party. See State v. Bolden, No. W2022-01127-CCA-R3-CD, 2024 WL 466168, at *14 (Tenn. Crim. App. Feb. 7, 2024); State v. Hodge, No. E2022-00303-CCA-R3-CD, 2023 WL 5472212, at *10 (Tenn. Crim. App. Aug. 24, 2023), perm. app. denied (Tenn. Feb. 13, 2024).

---

[7] See In Re: COVID-19 Pandemic, No. ADM 2020-00428 (Tenn. Mar. 13, 2020) (Order) (suspending jury trials through March 31, 2020); In Re: COVID-19 Pandemic, No. ADM2020-00428 (Tenn. Mar. 25, 2020) (Order) (extending suspension through April 30, 2020); In Re: COVID-19 Pandemic, No. ADM2020-00428 (Tenn. Apr. 24, 2020) (Order) (extending suspension through July 3, 2020); In Re: COVID-19 Pandemic, No. ADM2020-00428 (Tenn. Nov. 17, 2020) (Order) (suspending jury trials from November 23, 2020 through January 31, 2021); In Re: COVID-19 Pandemic, No. ADM2020-00428 (Tenn. Dec. 22, 2020) (Order) (extending suspension through February 26, 2021); In Re: COVID-19 Pandemic, No. ADM2020-00428 (Tenn. Jan. 14, 2021) (Order) (extending suspension through March 31, 2021).

- 14 -

The trial court rescheduled the Appellant's trial four times—three times after the Appellant's motions to continue, and once after the Appellant's retained counsel died. The delay caused by the death of retained counsel does not weigh against either party. The delay caused by the Appellant's requests for continuances, however, weighs against the Appellant. Because the missing discovery was part of the reason for the requests, the weight is slight. Still, we decline to attribute this delay to the State. The Appellant's retained counsel requested the first continuance both because the Appellant was requesting more discovery and because counsel had not finished reviewing the provided discovery. He requested the second continuance solely because he had not finished reviewing the provided discovery. The Appellant, while acting pro se, requested the third continuance because his forensic expert had allegedly not yet received the electronic data. Because the first two continuances were in part, or solely, because the Appellant's retained counsel had not finished reviewing discovery, the reason for delay weighs slightly against the Appellant. See Vermont v. Brillon, 556 U.S. 81, 90-91 (2009) ("delay caused by the defendant's counsel is also charged against the defendant").

**C. Assertion of the Right**. A defendant's failure to assert his right to a speedy trial is not a waiver of the right, but "will make it difficult for a defendant to prove that he was denied a speedy trial." Barker, 407 U.S. at 532; see also Bishop, 493 S.W.2d at 84. The Appellant alleges that he vaguely asserted his right on July 27, 2021, when he "orally inquired of the trial court 'why some of this took so long' while he was 'just . . . sitting and waiting' in prison[.]" He emphasizes this court's previous statement that "[e]ven a vague request for a more timely trial that does not explicitly mention the Sixth Amendment guarantee or the desire for a speedy trial is sufficient to be considered an assertion of the right." State v. Nichols, No. E2008-00169-CCA-R3-CD, 2009 WL 2633099, at *7 (Tenn. Crim. App. Aug. 27, 2009), perm. app. denied (Tenn. Mar. 1, 2010) (citing State v. Easterly, 77 S.W.3d 226, 237 (Tenn. Crim. App. 2001)). The State responds that the Appellant's comments were not a demand for a speedy trial and, therefore, the Appellant did not assert his right until December 20, 2021.

We agree with the State that the Appellant did not assert his right to a speedy trial until December 20, 2021, two years and seven months after his arrest. His trial began five months later. Though a defendant can assert his right without explicitly mentioning the Sixth Amendment or his desire for a speedy trial, we decline to construe the Appellant's isolated comment on July 27, 2021 as an assertion of his right to a speedy trial. Because the Appellant's assertion of his right was not timely, this factor weighs only slightly in the Appellant's favor.

**D. Prejudice to the Defendant**. The most important factor is whether the accused suffered prejudice from the delay. Simmons, 54 S.W.3d at 760. This factor is assessed in light of the interests the right to a speedy trial is designed to protect—preventing oppressive

- 15 -

pretrial incarceration, minimizing anxiety and concern of the accused, and limiting the possibility that the defense will be impaired. Id.; see also Barker, 407 U.S. at 532. However, "pretrial anxiety and concern are always present to some extent, and thus absent some unusual showing [are] not likely to be determinative in [a] defendant's favor." Moon, 644 S.W.3d at 80 (quoting State v. Hernandez, No. M2016-02511-CCA-R3-CD, 2019 WL 2150171, at *40 (Tenn. Crim. App. May 15, 2019), perm. app. denied (Tenn. Sept. 18, 2019)) (internal quotations omitted).

The Appellant argues that the State's "failure to locate and turn over [certain evidence] severely hampered [the Appellant's] ability to prepare a defense for trial and greatly increased his anxiety and concern because he knew that additional evidence was missing all along." The State responds that the Appellant failed to show prejudice because he "did not seek admission of [the] files as evidence and he fails to show that they would have been relevant to any issue before the court."

The Appellant does not allege, nor does the record show, that the three-year delay prejudiced his defense at trial. The Appellant obtained the missing videos before trial and did not introduce them at trial. Though the Appellant's knowledge that the State had additional video evidence that it had not provided in discovery caused him pretrial anxiety and concern, this anxiety and concern alone does not establish prejudice in light of the other Barker factors. In the absence of any discernable prejudice, this factor weighs against the Appellant.

After balancing the Barker factors, we conclude that the Appellant's right to a speedy trial was not violated. The three-year delay was caused by COVID-19, the death of the Appellant's retained counsel, and the Appellant's requests for continuances. The Appellant did not assert his right to a speedy trial until two years and seven months after his arrest. Additionally, the Appellant suffered no discernable prejudice. The Appellant is therefore not entitled to relief.

**II. Sufficiency of the Evidence**. The Appellant argues that the evidence is insufficient to support his conviction of second degree murder. The Appellant challenges that he committed the killing "knowingly." The State responds, and we agree, that the evidence is sufficient to support the conviction.

"Because a verdict of guilt removes the presumption of innocence and raises a presumption of guilt, the criminal defendant bears the burden on appeal of showing that the evidence was legally insufficient to sustain a guilty verdict." State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009) (citing State v. Evans, 838 S.W.2d 185, 191 (Tenn. 1992)). "Appellate courts evaluating the sufficiency of the convicting evidence must determine 'whether, after viewing the evidence in the light most favorable to the prosecution, any

- 16 -

rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" State v. Wagner, 382 S.W.3d 289, 297 (Tenn. 2012) (quoting Jackson v. Virginia, 443 U.S. 307, 319 (1979)). The State is entitled to the strongest legitimate view of the evidence and all reasonable inferences that may be drawn from that evidence. State v. Davis, 354 S.W.3d 718, 729 (Tenn. 2011) (citing State v. Majors, 318 S.W.3d 850, 857 (Tenn. 2010)). The jury as the trier of fact must evaluate the credibility of the witnesses, determine the weight given to witnesses' testimony, and reconcile all conflicts in the evidence. State v. Campbell, 245 S.W.3d 331, 335 (Tenn. 2008) (citing Byrge v. State, 575 S.W.2d 292, 295 (Tenn. Crim. App. 1978)). This court "neither re-weighs the evidence nor substitutes its inferences for those drawn by the jury." Wagner, 382 S.W.3d at 297 (citing State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997)).

As convicted in this case, second degree murder is the "knowing killing of another[.]" Tenn. Code Ann. § 39-13-210(a)(1). In order to establish this offense, the State must prove beyond a reasonable doubt that "(1) the defendant killed the victim, and (2) the defendant committed the killing with a 'knowing' state of mind." State v. Parker, 350 S.W.3d 883, 904 (Tenn. 2011).

To prove that the Appellant "knowingly" killed the victim, the State was required to show that his actions were:

[K]nowing[] with respect to the conduct or to circumstances surrounding the conduct when the person is aware of the nature of the conduct or that the circumstances exist. A person acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result.

Tennessee Code Annotated § 39-11-302(b). The Tennessee Supreme Court has provided guidance in determining whether a defendant "knowingly" kills a victim:

Because this Court has determined that "[s]econd degree murder is a result of conduct offense," State v. Brown, 311 S.W.3d 422, 431-32 (Tenn. 2010), "[t]he 'nature of the conduct' that causes death or the manner in which one is killed is inconsequential under the second degree murder statute. The statute focuses purely on the result and punishes an actor who knowingly causes another's death." State v. Ducker, 27 S.W.3d 889, 896 (Tenn. 2000). Thus, the proof to support the mens rea element of second degree murder needs to demonstrate beyond a reasonable doubt only that the accused "knew that his or her actions were reasonably certain to cause the victim's death." Brown, 311 S.W.3d at 432.

- 17 -

<u>Parker</u>, 350 S.W.3d at 904.

The Appellant argues that he did not "knowingly" kill the victim because he was not aware of his actions at the time of the victim's death. The Appellant refers to his testimony during trial wherein he claimed an inability to remember the events after the physical fight between him and the victim began. Viewed in the light most favorable to the State, the proof at trial established that the Appellant was aware that his conduct could have reasonably resulted in the victim's death. The victim sustained forty injuries to her head, neck, torso, and extremities by multiple weapons. The Appellant testified to attacking the victim in self-defense. Though he was unsure which knife he used in the killing, the Appellant did not deny that he had used a knife to stab the victim. Based on these facts, a rational jury could have found the Appellant knowingly killed the victim. See <u>State v. Norman</u>, No. M2009-01246-CCA-R3-CD, 2010 WL 3448108, at *15 (Tenn. Crim. App. Sept. 2, 2010), <u>perm. app. denied</u> (Tenn. Dec. 8, 2010) (holding that the jury could reasonably conclude based upon the defendant's choice to use an axe in response to a deadly threat that he was aware striking the victim with it was reasonably certain to cause death); <u>State v. Raines</u>, No. E2007-00840-CCA-R3-CD, 2008 WL 2152495, at *5 (Tenn. Crim. App. May 21, 2008), <u>perm. app. denied</u> (Tenn. Aug. 25, 2010) (holding that the evidence was sufficient to support second degree murder where the defendant pulled a pistol and fired a single shot at an unarmed victim after victim threatened and then approached defendant). Accordingly, the evidence was sufficient to support the Appellant's conviction of second degree murder, and he is not entitled to relief.

**III. <u>Self-Defense Instruction</u>**. The Appellant next argues the trial court erred by failing to give a jury instruction on self-defense after the issue was properly raised in the proof. He contends that the trial court's reliance on <u>Benson</u> during its ruling does not take into consideration the Appellant's own testimony that the victim had a knife in her hand at one point. The State responds that the Appellant failed to show a fear of imminent death or serious bodily harm in its case-in-chief and failed to properly raise a claim of self-defense.

The right to trial by jury is guaranteed by the United States and Tennessee Constitutions. U.S. Const. amend. VI; Tenn. Const. art. I, § 6. Proceeding from this right to a jury trial is a defendant's "right to a correct and complete charge of the law." <u>Hanson</u>, 279 S.W.3d at 280 (citing <u>State v. Garrison</u>, 40 S.W.3d 426, 432 (Tenn. 2000)). "An instruction should be considered prejudicially erroneous only if the jury charge, when read as a whole, fails to fairly submit the legal issues or misleads the jury as to the applicable law." <u>State v. Faulkner</u>, 154 S.W.3d 48, 58 (Tenn. 2005). Because the propriety of jury instructions is a mixed question of law and fact, the standard of review is de novo with no presumption of correctness. <u>State v. Smith</u>, 492 S.W.3d 224, 245 (Tenn. 2016). Erroneous jury instructions are subjected to a "harmless error" analysis and will be considered

prejudicial error if they "mislead the jury as to the applicable law or fail to 'fairly submit' the relevant legal issues, such as available defenses." State v. Hawkins, 406 S.W.3d 121, 128 (Tenn. 2013) (citing State v. Vann, 976 S.W.2d 93, 101 (Tenn. 1998)).

Self-defense must be fairly raised by the proof to be submitted to the jury. Tenn. Code Ann. § 39-11-203(c); Benson, 600 S.W.3d at 903. "When determining if a defense has been fairly raised by the proof, the court must consider the evidence in the light most favorable to the defendant, including all reasonable inferences that can be made in the defendant's favor." Benson, 600 S.W.3d at 903 (citing Hawkins, 406 S.W.3d at 129). If self-defense is submitted to the jury, the State has the burden of negating the defendant's claim of self-defense beyond a reasonable doubt. Id.

The Appellant argues that he killed the victim in self-defense. Tennessee Code Annotated section 39-11-611(b)(2) (2017), which was in effect at the time of the offense, states:

> (2) Notwithstanding § 39-17-1322, a person who is not engaged in unlawful activity and is in a place where the person has a right to be has no duty to retreat before threatening or using force intended or likely to cause death or serious bodily injury, if:
>
> (A) The person has a reasonable belief that there is an imminent danger of death or serious bodily injury;
>
> (B) The danger creating the belief of imminent death or serious bodily injury is real, or honestly believed to be real at the time; and
>
> (C) The belief of danger is founded upon reasonable grounds.

Citing Benson, the trial court found that there was not a reasonable belief that the Appellant was in imminent fear of death or serious bodily injury. The trial court reasoned as follows:

> Now, the [Appellant] testified that when they were in the kitchen [], the victim, said I'm going to get a knife and cut him -- cut you. But [the Appellant] didn't let her get to the knife. He pushed her towards the living room, he yelled for help. He -- they walked back into the bedroom, he followed her. And that's where the killing occurred.
>
> The Benson case talks about self-defense in two different ways. I mean, clearly self-defense -- obviously, if you were using non-lethal self-defense

- 19 -

versus lethal self-defense. And . . . Justice Page said the bar is substantially higher for one trying to fairly raise the issue of the valid use of deadly force. The person has to have a reasonable belief that there is an imminent danger of death or serious bodily injury. I mean, I don't know that [the Appellant] testified to that. The danger of creating the belief of imminent death or bodily injury must be real or honestly believed to be real and the danger was founded upon reasonable grounds. Well, I mean, it's sort of an analogy that if someone said hey, I'm going to shoot you, but didn't have a gun, could you take a gun and shoot them. If she says I'm going to cut you, but didn't have a knife, could he reasonably fear enough to stab her to death? Well, the analogy would be the same. If I said I was going to shoot you, but didn't have a gun, then I couldn't shoot you. So it would not be reasonable to shoot and kill the person who made the threat. So I'm holding that it's not been fairly raised by the evidence. I don't think there's a reasonable belief that he was in imminent fear of death or serious bodily injury at the hands of Ms. Alexander. So I'm not going to charge self-defense.

During the motion for new trial hearing, the trial court acknowledged the second confrontation in the Appellant's bedroom and found "the proof in this case was solely the [Appellant's] testimony[,]" which "could be sufficient . . . from time to time, to warrant a self-defense argument." However, the trial court stated that "no proof, no photographs, nothing [] showed a box of knives in the bedroom." Accordingly, the trial court again concluded that self-defense was not fairly raised by the proof.

In Benson, the Tennessee Supreme Court held that the defendant failed to fairly raise the proof necessary to show he "reasonably feared imminent death or serious bodily injury to justify his use of deadly force." 600 S.W.3d at 907. When punched in the nose by a small, unarmed woman during a verbal altercation, the defendant responded by pulling out his handgun and fatally shooting her five times. Id. at 900. The victim sustained one gunshot wound to her left cheek, one wound to her upper chest, one to her right shoulder, and two to the left of her back. Id. The defendant argued self-defense at trial, claiming that the victim had been the first aggressor and initiated the events that led to her being fatally shot. Id. The court concluded that though the defendant raised the proof necessary to argue non-lethal self-defense in response to being punched, he had not met the higher threshold required for the use of deadly force. Id. at 907. This bar was not met because the proof at trial showed that the victim was unarmed and there was no reasonable threat of death or serious bodily injury. Id.

The record shows that the Appellant testified during cross-examination that the victim threatened to harm him right before she reached for a nearby knife. As the trial court made its initial ruling during trial, it reflected solely on the initial confrontation in the

kitchen where the Appellant testified he kept the victim away from the knife. However, the confrontation continued beyond that point, and, unlike Benson, the Appellant in the present case testified to a more imminent danger than an unarmed attack. The Appellant claimed that immediately after the victim reached for a knife in the kitchen, she went to his bedroom and again reached for a weapon in the junk drawer near the entrance. She continued to threaten that she was going to "cut or stab" him as she attempted to grab a knife. After that, the Appellant testified that a physical struggle occurred between the two for the knife, and that the victim reached once more for the knife after it had fallen to the ground. The Appellant claimed that the only thing he could recall afterward was "wanting to protect [himself]."

Although the Appellant also testified, as noted by the trial court, that he never claimed the victim "[came] at [him] with a knife," he nevertheless testified to her threatening him and a struggle occurring over a blade. During closing arguments, the State itself treated the Appellant's self-defense claims as fairly raised and refuted its validity to the jury.

The State on appeal also contends the Appellant never testified outright that he feared death or serious bodily injury, nor that it was necessary to kill the victim. The Appellant responds in both his initial brief and reply brief, and we agree, that a defendant's testimony is not required for a trial court to charge self-defense. See State v. Cole-Pugh, 588 S.W.3d 254, 264 (Tenn. 2019) ("A defendant need not testify that he reasonably feared imminent bodily harm; the trial court may draw this inference from the evidence as it is viewed in the light most favorable to the defendant[.]"). The Appellant testified to facing a threat that he believed could be deadly when the victim threatened him and fought for possession of a knife multiple times. Based on the above proof, we conclude that self-defense was fairly raised by the evidence offered at trial.

However, we agree with the State that any error in failing to charge self-defense was harmless beyond a reasonable doubt because no reasonable jury would have accepted the Appellant's self-defense theory. See State v. Perrier, 536 S.W.3d 388, 404-05 (Tenn. 2017) (concluding that the trial court's error in instructing the jury regarding self-defense was harmless beyond a reasonable doubt "because no reasonable jury would have accepted the defendant's self-defense theory"). The victim's received forty sharp force and defensive injuries. The forensic pathologist testified that the cause and severity of the victim's injuries would have required "repeated attempts[.]" Accordingly, the Appellant is not entitled to relief on this claim.

**IV. Probation Officer's Testimony**. The Appellant argues on appeal that the trial court erred by allowing his probation officer to testify regarding her occupation and her reason for being at the Appellant's home on the day of the offense. The Appellant claims

that the testimony of his probation officer was not relevant and overly prejudicial since she never entered the home. The State responds, and we agree, that the probative value of her occupation and relationship with the Appellant outweighed any prejudicial effect by providing context as to why she was at the Appellant's home.

Rule 404(b) provides that:

**Other Crimes, Wrongs, or Acts.** Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity with the character trait. It may, however, be admissible for other purposes. The conditions which must be satisfied before allowing such evidence are:

(1) The court upon request must hold a hearing outside the jury's presence;

(2) The court must determine that a material issue exists other than conduct conforming with a character trait and must upon request state on the record the material issue, the ruling, and the reasons for admitting the evidence;

(3) The court must find proof of the other crime, wrong, or act to be clear and convincing; and

(4) The court must exclude the evidence if its probative value is outweighed by the danger of unfair prejudice.

Tenn. R. Evid. 404(b). Pursuant to the Advisory Commission Comment to Rule 404, "evidence of other crimes should usually be excluded." Tenn. R. Evid 404(b), Adv. Comm'n Cmt. However, in exceptional cases, "where another crime is arguably relevant to an issue other than the accused's character," such as "identity (including motive and common scheme or plan), intent, or rebuttal of accident or mistake," the evidence may be admissible. Id.; see State v. Berry, 141 S.W.3d 549, 582 (Tenn. 2004) (stating that evidence of other crimes, wrongs, or acts may be admissible if it establishes the defendant's motive, intent, guilty knowledge, identity of the defendant, absence of mistake or accident, a common scheme or plan, completion of the story, opportunity, or preparation). Additionally, evidence of other acts may be admitted to provide the jury with necessary contextual background. State v. Gilliland, 22 S.W.3d 266, 272 (Tenn. 2000); see also State v. Little, 402 S.W.3d 202, 210 (Tenn. 2013) ("Moreover, this Court has expanded the list of exceptions to include a limited amount of other crimes evidence when necessary to provide a 'contextual background.'").

In Gilliland, the Tennessee Supreme Court held that to ascertain the admissibility of evidence of other crimes, wrongs, or acts for the purpose of providing contextual background, the State must establish and the trial court must find that: "(1) the absence of the evidence would create a chronological or conceptual void in the state's presentation of its case; (2) the void created by the absence of the evidence would likely result in significant jury confusion as to the material issues or evidence in the case; and (3) the probative value of the evidence is not outweighed by the danger of unfair prejudice." Gilliland, 22 S.W.3d at 272.

If a trial court does not substantially comply with the procedural requirements of Rule 404(b), then this court will review the trial court's admissibility ruling de novo. State v. Clark, 452 S.W.3d 268, 287 (Tenn. 2014). However, if a trial court substantially complies with Rule 404(b)'s requirements, the court's ruling will not be overturned absent an abuse of discretion. Id. (citing State v. Kiser, 284 S.W.3d 227, 288-89 (Tenn. 2009); State v. DuBose, 953 S.W.2d 649, 652 (Tenn. 1997)). This court will find an abuse of discretion "only when the trial court applied incorrect legal standards, reached an illogical conclusion, based its decision on a clearly erroneous assessment of the evidence, or employed reasoning that causes an injustice to the complaining party." State v. Banks, 271 S.W.3d 90, 116 (Tenn. 2008) (citing Konvalinka v. Chattanooga–Hamilton Cnty. Hosp. Auth., 249 S.W.3d 346, 358 (Tenn. 2008)).

The Appellant concedes in his principal brief that the trial court substantially complied with Rule 404(b)'s procedural requirements despite not explicitly weighing the probative value of the testimony against its prejudicial effect. However, it has previously been held that a trial court's failure to make an explicit finding on the record that the probative value was not outweighed by the danger of unfair prejudice makes its ruling subject to de novo review. DuBose, 953 S.W.2d at 652-53 (reviewing admission of evidence de novo after trial court failed to balance probative and prejudicial value); State v. Berkley, No. W2015-00831-CCA-R3-CD, 2016 WL 3006941, at *10 (Tenn. Crim. App. May 17, 2016), perm. app. denied (Tenn. Sept. 23, 2016) (concluding that the trial court's failure to make an explicit finding on the record that the probative value outweighed the prejudicial effect subjected the admission of evidence to de novo review). Because the trial court made no such finding in this case, we will review the admission of the testimony de novo.

The record shows that the probation officer's testimony was admitted at trial over the objection of defense counsel. The trial court allowed the probation officer to testify for the purposes of "context[.]" The trial court made only one finding during the bench conference:

- 23 -

All right. . . . I'm going to sustain [defense counsel] objection if you're bringing in anything about what he is on probation for. But it does provide contextual information . . . that the jury is entitled to hear.

As reflected in the factual section above, the probation officer testified that the Appellant was a probationer of hers, and that she was at his home on the day of the offense for an initial home visit. She said that she heard a scream inside the home, followed by noises, then silence, and that she and her partner immediately called 911, although she had originally believed the noise to be caused by children. The probation officer and her partner left and were soon called back to the home by law enforcement, and they knocked on the doors and windows but received no answer. The probation officer and her partner left again and were called back a second time. She subsequently gave a statement to a responding officer.

The trial court did not err in allowing the Appellant's probation officer to testify about her occupation and her reason for being at the Appellant's home. The probation officer's testimony was related to a material issue by introducing to the jury that loud noises were heard within the home around the time the victim's murder occurred. It also explained the circumstances surrounding responding officers' first visit to the home. We agree with the State that excluding mention of the probation officer's occupation and relationship to the Appellant would have left the jury confused concerning why she was present at the Appellant's home that day. We also agree with the State that exclusion may have caused jury confusion regarding why the probation officer would have notified the police upon the first sign of difficulty with completing the visit. See Gilliland, 22 S.W.3d at 272. The evidence in her testimony concerning her occupation was admissible for the "other purpose" exception under Rule 404(b) where exclusion would create a "chronological or conceptual void" in the case for the jury. Id.

References to the Appellant's probation status were minimal and the evidence had a low danger of unfair prejudice. During the probation officer's testimony, the trial court limited its prejudicial effect and only allowed the probation officer to testify about her relationship to the Appellant and the reason for being at his home. The Appellant is not entitled to relief.

**V. Photographs**. The Appellant argues that the trial court abused its discretion by admitting ten photographs that were not relevant and unduly prejudicial. The State responds that the photographs were properly admitted, and even if they were not, the error is harmless because "the evidence of the [Appellant's] guilt is overwhelming."

On March 19, 2021, the Appellant's retained counsel filed a motion to exclude certain crime scene photographs from the trial under Tennessee Rules of Evidence 401 and

403. The State filed a response arguing that the photographs were admissible because they provided proof that the murder was intentional and premeditated. At the April 7, 2021 hearing on the motion, the State further explained:

> We're not presenting these photographs in order to shock the jury. It all goes to the question of premeditation. This is filed as a first [] degree murder case. And the repeated blows using different kinds of instruments are indicia of premeditation, and that's what we plan to prove at trial.

The trial court discussed each photograph, excluding some that were duplicative and reserving a ruling until trial for some that were "close" or "[were] in fact pretty graphic." The court concluded that the remaining photographs were admissible because they were "not overly gruesome" and showed either: (1) the weapons used; (2) where those weapons were found in relation to the victim's body; or (3) the victim's unbroken finger nails. On December 20, 2021, the court issued its order denying the motion in part. At trial, none of the remaining photographs were admitted into evidence.

On May 19, 2022, four days before trial, the Appellant's newly-appointed trial counsel filed a motion to exclude "all unfairly prejudicial photos, whether made before the death of the victim or after." The State filed a response highlighting that the trial court had already ruled on the crime scene photographs. The State also noted that it "[had] one photograph of the victim, taken prior to her death, that the State intend[ed] to use during the guilt phase to identify the victim for the witnesses and the jury." The photograph, attached to the response, showed the victim in her college cheerleading uniform. The record does not contain a pretrial ruling on the life-in-being photograph. During trial, the Appellant objected to admission of the photograph by stating, "We've had this hearing before. But for the purpose of appeal, I have to make the objection again." The trial court responded, "All right," and the photograph was admitted.

At the motion for new trial hearing, the Appellant argued that the trial court erred by admitting the life-in-being photograph and crime scene photographs because they were not relevant and unduly prejudicial. The State argued that the life-in-being photograph was "simply necessary to personalize the victim." In its order denying the motion, the trial court stated that "[t]he life-in-being photograph personalized the victim for the jury and was not highly prejudicial." The court also stated that the photograph of the victim's entire body "was not unduly graphic" and the remaining crime scene photographs "were not highly prejudicial."

The admission of photographs lies within the sound discretion of the trial court, whose ruling we will not disturb absent a showing that the trial court abused its discretion. State v. Odom, 336 S.W.3d 541, 565 (Tenn. 2011) (citing State v. Banks, 564 S.W.2d 947,

949 (Tenn. 1978)). "The reviewing court need not find that the trial court made the best decision or the one the appellate court would have made; instead, the reviewing court must confine itself to determining whether the trial court's decision was within the range of acceptable alternatives." State v. Willis, 496 S.W.3d 653, 729 (Tenn. 2016).

In order to be admitted into evidence, a photograph must be relevant to an issue in dispute. Vann, 976 S.W.2d at 102; Tenn. R. Evid. 402. Relevant evidence is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. Even a relevant photograph, however, "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Tenn. R. Evid. 403. Unfair prejudice is "an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." Banks, 564 S.W.2d at 951. This court has also stated that "[p]rejudice becomes unfair when the primary purpose of the evidence at issue is to elicit emotions of 'bias, sympathy, hatred, contempt, retribution, or horror.'" State v. Collins, 986 S.W.2d 13, 20 (Tenn. Crim. App. 1998) (quoting M. Graham, Handbook of Federal Evidence 182-83 (2d ed. 1986)).

**A. Life-in-Being Photograph**. The Appellant first challenges the admission of exhibit 2, the life-in-being photograph of the victim in her college cheerleading uniform. He contends that: (1) the photograph was not relevant because neither the existence of a life-in-being nor the general appearance of the victim was at issue; and (2) the photograph "unnecessarily evok[ed] the sympathy and emotions of the jury," creating a danger of unfair prejudice that substantially outweighed any probative value. The State responds that the Appellant has waived this issue because there is no record of its consideration by the trial court. See State v. Ballard, 855 S.W.2d 557, 560-61 (Tenn. 1993). Alternatively, the State argues that the trial court did not abuse its discretion because: (1) Tennessee Code Annotated section 40-38-103(c) permitted the admission of the photograph, "assuming the State offered [it] as evidence to show the victim's appearance before her death"; and (2) "[n]othing about the photograph suggests any danger of unfair prejudice." We conclude that the Appellant properly preserved the issue and that the trial court abused its discretion by admitting the photograph.

The Appellant properly preserved the issue of the life-in-being photograph's admissibility. A party seeking appellate review has a "duty to prepare a record which conveys a fair, accurate and complete account of what transpired with respect to the issues forming the basis of the appeal." Ballard, 855 S.W.2d at 560; see also Tenn. R. App. P. 24(b). In Ballard, the Tennessee Supreme Court held that the defendant failed to preserve an issue when the record did not contain transcripts of three separate hearings the defendant

- 26 -

stated were held on the issue. 855 S.W.2d at 560. In this case, however, neither party has alleged that the trial court considered the issue beyond what is reflected in the record. The Appellant's newly-appointed trial counsel filed the motion to exclude the photograph on a Thursday and trial began on the following Monday. The record does not contain a transcript of a hearing or an order on the motion. At trial, the Appellant objected to the photograph's admission, stating "We've had this hearing before. But for the purpose of appeal, I have to make the objection again." The court responded, "All right," and admitted the photograph. Despite trial counsel's reference to a previous hearing, neither party on appeal has alleged that there was such a hearing in the short time between the filing of the motion and trial. The State emphasizes that the Appellant "provides no reference or citation to the record where this issue was addressed in a prior hearing." This lack of citation to the record, without a claim that the court did conduct a hearing that the Appellant failed to include a transcript of, is not enough for this court to conclude that the record is incomplete. Accordingly, we will address the merits of this issue.

The Tennessee Supreme Court has "consistently cautioned" against the admission of life-in-being photographs because they "typically lack relevance to the issues on trial" and have the "potential to unnecessarily arouse the sympathy of the jury." State v. Adams, 405 S.W.3d 641, 657 (Tenn. 2013). Prior to admitting a life-in-being photograph, the trial court "must determine whether the photographs are relevant by considering whether the purported use of the photograph—such as depicting a life-in-being—is a disputed issue at trial." Id. at 658. If the issue is not disputed, then the photograph is not relevant and must be excluded. Tenn. R. Evid. 402. Following Adams, the legislature amended Tennessee Code Annotated section 40-38-103(c), which now provides that "[i]n a prosecution for any criminal homicide, an appropriate photograph of the victim while alive shall be admissible evidence when offered by the district attorney general to show the general appearance and condition of the victim while alive." Despite the statute's mandatory language, a photograph relevant to show the general appearance and condition of the victim while alive may still be excluded it if its probative value is substantially outweighed by a danger of unfair prejudice under Rule 403. State v. Reed, No. E2019-00771-CCA-R3-CD, 2020 WL 5588677, at *24 (Tenn. Crim. App. Sept. 18, 2020), no perm. app. filed (citing State v. Donaldson, No. E2019-00543-CCA-R3-CD, 2020 WL 2494478, at *10 (Tenn. Crim. App. May 14, 2020), no perm. app. filed).

The trial court abused its discretion by admitting a life-in-being photograph of the victim in her college cheerleading uniform because it was not relevant to a disputed issue at trial. Though the State argues that the photograph is admissible "assuming the State offered [it] as evidence to show the victim's appearance before her death," we need not assume the State's reason for offering the photograph. Before trial, the State explicitly said it intended to use the photograph to prove the victim's identity. At the hearing on the Appellant's motion for new trial, the State said that the photograph was "simply necessary

to personalize the victim." Though the trial court did not explain its reasoning for admitting the photograph during trial, the court explained in its order denying the Appellant's motion for new trial that the photograph was properly admitted because it "personalized the victim for the jury." Neither of these purported uses justify the admission of the photograph. The victim's identity was not disputed and a desire to personalize the victim does not render irrelevant evidence admissible. Because the photograph was not relevant to any disputed issue at trial and served only to "personalize the victim[,]" which was not relevant to any issue at trial, it should have been excluded. See Adams, 405 S.W.3d at 657; Tenn. R. Evid. 402.

Despite the trial court's abuse of discretion, the Appellant is not entitled to relief because the error was harmless. "Generally, photographs taken during the life of a victim are not so prejudicial as to warrant a new trial." Adams, 405 S.W.3d at 658. Though the photograph may have aroused sympathy from the jury, the evidence against the Appellant was overwhelming. See State v. Young, 196 S.W.3d 85, 106-07 (Tenn. 2006) ("While the jury's sympathies may have been stirred by the photographs of the victim as a child, we are convinced beyond any doubt that the jury would have rendered the same verdict of guilt had the photographs been excluded[.]"). However, the fact that we conclude that the error in the present case was harmless should not be taken as support for the admission of similarly irrelevant life-in-being photographs in future cases. Adams, 405 S.W.3d at 658 (citing State v. Richardson, 995 S.W.2d 119, 128 (Tenn. Crim. App. 1998) (stating that the conclusion that the prosecutor's biblical reference at trial was harmless error "should not be taken as precedent for similar improper argument in the future")).

**B. Crime Scene Photographs**. The Appellant next challenges the admission of nine crime scene photographs. The challenged photographs are: exhibits 5 (color photograph of the victim's body and the surrounding area); 7A (color photograph of the serrated razor blade); 7B (color photograph of the serrated razor blade, from further away); 7C (color photograph of the victim's left leg, with her phone and the large knife with a brown handle visible); 7D (color photograph of the victim's hand and long, unbroken finger nails); 7E (color photograph of the victim's right leg, and the knife with a silver handle under her calf); 7F (color photograph of a camera and the folding knife, with the victim's body from the waist up visible); 7G (color photograph of the large knife with a brown handle); and 7H (color photograph of the victim's phone next to the large knife with a brown handle). The Appellant contends that these photographs were "irrelevant, unduly graphic, and highly prejudicial." He emphasizes that the photographs were needlessly cumulative of testimonial evidence and therefore "added nothing but sympathy and horror." The State responds that the photographs were relevant to establish the cause and manner of the victim's death, as well as the defendant's intent, and were not "overly gruesome or shocking."

"Crime scene photographs of a victim tend to be prejudicial by nature, but this fact does not make them excludable per se." Adams, 405 S.W.3d at 658. Photographs of a victim's body are admissible "if they are relevant to the issues on trial, notwithstanding their gruesome and horrifying character." Banks, 564 S.W.2d at 950-51. "The more gruesome the photographs, the more difficult it is to establish that their probative value and relevance outweigh their prejudicial effect." Id. at 951. When assessing whether the probative value of a relevant photograph of a victim's body is substantially outweighed by a danger of unfair prejudice, the trial court must consider the following:

> the value of photographs as evidence, that is, their accuracy and clarity, and whether they were taken before the corpse was moved, if the position and location of the body when found is material; the inadequacy of testimonial evidence in relating the facts to the jury; and the need for the evidence to establish a prima facie case of guilt or to rebut the defendant's contentions.

Id. If the photographs do not add anything to testimonial descriptions of the injuries, they may be excluded. Id. However, "photographs are not necessarily rendered inadmissible because they are cumulative of other evidence or because descriptive words could be used." Willis, 496 S.W.3d at 728 (quoting State v. Williamson, No. M2010-01067-CCA-R3-CD, 2011 WL 3557827, at *9 (Tenn. Crim. App. Aug. 12, 2011), perm. app. denied (Tenn. Dec. 14, 2011)). "[T]he fact that the State could have made its case using only descriptive words is a consideration in balancing the probative value against the prejudicial effect, but does not mandate exclusion of the photographs." Id.

We cannot conclude that the trial court's decision to admit the crime scene photographs was outside the range of acceptable alternatives. The State offered the photographs to show that the killing was intentional and premeditated. Because whether the killing was intentional and premeditated was disputed at trial, the photographs were relevant. The photographs showed the brutality of the attack and the four weapons used, from which the jury could have inferred the killing was intentional and premeditated. See Banks, 564 S.W.2d at 950 (a jury may infer that the killing was premeditated and intentional based on the brutality of the attack). The fact that other evidence established the extent of the victim's injuries, the weapons used, and where those weapons were found in relation to the victim's body decreases the probative value of the photographs, but it does not mandate their exclusion. See Willis, 496 S.W.3d at 728. The photographs were clear, accurate, and taken before the victim's body was moved. Though the photographs show significant injuries to the victim and a substantial amount of blood, the trial court found that the photographs "were not overly gruesome" and, therefore, not highly prejudicial. Accordingly, the trial court did not abuse its discretion, and the Appellant is not entitled to relief. See id. at 725-29 (holding that the trial court did not abuse its discretion by admitting "quite disturbing" photographs, including one of a "severed and

- 29 -

severely decomposed head" because they showed premeditation); <u>Banks</u>, 564 S.W.2d at 949 ("Photographs showing the injuries of the victim are properly admitted if the defendant admits he killed the victim but seeks to show a non-criminal homicide or that the offense was of a lesser degree than murder.").

**VI. <u>Sentencing</u>**. The Appellant lastly argues that the trial court abused its discretion by imposing the maximum within-range sentence for second degree murder and ordering it to be served consecutively with his four-year probation violation sentence. The State responds, and we agree, that the trial court acted within its discretion.

**A. <u>Sentence Length</u>**. The Appellant contends that the trial court's twenty-five year sentence does not reflect any consideration of the mitigation proof presented by the Appellant. He claims the four character reference letters submitted to the court supported mitigating factors (11) and (13), that the offense was committed under circumstances so unusual that the Appellant likely did not intend to violate the law and the "catchall" factor. <u>See</u> Tenn. Code Ann. § 40-35-113. The State responds that the trial court considered the mitigation proof by the Appellant relevant to factor (11) and rejected it. We agree with the State.

A trial court's sentencing determinations are subject to an abuse of discretion standard of review and will be upheld "so long as the statutory purposes and principles of the Sentencing Act, along with any applicable enhancement and mitigating factors, have been properly addressed." <u>State v. Bise</u>, 380 S.W.3d 682, 706 (Tenn. 2012). "[A] sentence imposed by a trial court should be upheld so long as it is within the appropriate sentencing range and is otherwise in compliance with the purposes and principles of the sentencing statute." <u>Id.</u> at 684. A trial court is "to be guided by—but not bound by—any applicable enhancement or mitigating factors when adjusting the length of a sentence." <u>Id.</u> at 706. A trial court's misapplication of an enhancement or mitigating factor does not invalidate the sentence imposed unless the trial court wholly departed from the 1989 Sentencing Act, as amended in 2005. <u>Id.</u>

The trial court must consider the following when determining the defendant's sentence:

(1) The evidence, if any, received at the trial and the sentencing hearing;

(2) The presentence report;

(3) The principles of sentencing and arguments as to sentencing alternatives;

(4) The nature and characteristics of the criminal conduct involved;

(5) Evidence and information offered by the parties on the mitigating and enhancement factors set out in §§ 40-35-113 and 40-35-114;

(6) Any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee;

(7) Any statement the defendant wishes to make on the defendant's own behalf about sentencing; and

(8) The result of the validated risk and needs assessment conducted by the department and contained in the presentence report.

Tenn. Code Ann. § 40-35-210(b). The defendant bears the burden of showing that the sentence is improper. Id. § 40-35-401(d), Sentencing Comm'n Cmts. The trial court must consider the defendant's potential for rehabilitation or treatment when determining the sentence. Id. § 40-35-102(3)(C), -103(5). The sentence imposed by the trial court must be "no greater than that deserved for the offense committed" and "the least severe measure necessary to achieve the purposes for which the sentence is imposed." Id. § 40-35-103(2), (4).

The Appellant cites as support State v. Jackson, No. W2021-00208-CCA-R3-CD, 2022 WL 370090, at *6 (Tenn. Crim. App. Feb. 8, 2022) wherein this court concluded that the trial court abused its discretion, modified the defendant's sentence, and remanded the matter for the limited purpose of properly reviewing the jury-imposed fine. In Jackson, defense counsel made an argument to the trial court pertaining to the defendant's extended and admitted history of substance abuse, attempts to seek treatment, and diagnosed schizophrenia, paranoia, and depression. Id. at *4. Additionally, the presentence report, Strong R Needs report, and witness testimony at trial corroborated the argument. However, when sentencing the defendant, the trial court stated, "I just don't find any mitigating factors to be present in this case. He indicated he has had a past drug abuse history of cocaine, marijuana and ecstasy. So, you know, I don't show any mitigating factors to be present." Id. This court held that the record clearly established the existence of mitigating proof that therefore should have been considered by the trial court when sentencing the defendant.

In this case, the trial court applied enhancement factors (1), (5), (9), and (13)(c) and applied no mitigating factors to the Appellant's second degree murder conviction. See Tenn. Code Ann. § 40-35-114. Although the Appellant contends the trial court's sentence does not reflect consideration of the mitigating proof, the record reflects that the trial court considered the evidence and information offered on mitigating and enhancement factors.

- 31 -

Two character reference letters were read aloud, and the remaining two were also submitted into evidence. The Appellant gave an allocution statement. The trial court then simply rejected the Appellant's mitigating proof by not applying any mitigating factors when it sentenced the Appellant to the maximum within-range sentence. A trial court does not need to express lengthy reasoning as to why it accepted or rejected the Appellant's mitigating proof, only that it had considered it. See Bise, 380 S.W.3d at 706 (quoting Rita v. United States, 551 U.S. 338, 356 (2007)) ("[W]hile '[t]he sentencing judge should set forth enough to satisfy the appellate court that he has considered the parties' arguments and has a reasoned basis for exercising his own legal decisionmaking authority,' there is no requirement that such reasoning be particularly lengthy or detailed.").

Moreover, this court held that there was error in Jackson where the trial court "refused to acknowledge" mitigating proof in light of abundant and overwhelming proof that amounted to the trial court having departed from the purposes and principles of the Sentencing Act. 2022 WL 370090, at *6. The only mitigating proof the Appellant argues was not considered were four character letters offered at the sentencing hearing to show that the crime was out of character for him that the trial court simply did not put great weight on. We conclude that the Jackson case is distinguishable by these facts.

Furthermore, though the Appellant argues that the trial court failed to properly consider the mitigating factors, we note that the statutory enhancement and mitigating factors are advisory only and that "a trial court's weighing of various mitigating and enhancement factors [is] left to the trial court's sound discretion." State v. Carter, 254 S.W.3d 335, 345 (Tenn. 2008); see also Bise, 380 S.W.3d at 706.

Therefore, we conclude the trial court did not abuse its discretion in sentencing the Appellant to the maximum within-range sentence. The trial court properly applied the purposes and principles of the Sentencing Act. When sentencing the Appellant, the trial court noted the Appellant's prior convictions and previous criminal history with the victim. It highlighted the gruesome nature of the victim's injuries. It also afforded little weight to the Appellant's allocution statement. The Appellant is not entitled to relief.

**B. Consecutive Sentences**. Additionally, the Appellant argues that the trial court erred in ordering the Appellant's twenty-five year sentence to be served consecutively to his four year sentence for violation of his probation. The State responds, and we agree, that the trial court correctly ordered the Appellant's sentences to run consecutively where the offense was committed while he was on probation.

"[T]he abuse of discretion standard, accompanied by a presumption of reasonableness, applies to consecutive sentencing determinations." State v. Pollard, 432 S.W.3d 851, 860 (Tenn. 2013). When the trial court fails to provide adequate reasons on

the record for imposing consecutive sentences, however, this court "should neither presume that the consecutive sentences are reasonable nor defer to the trial court's exercise of its discretionary authority." Id. at 863-64. Instead, this court "has two options: (1) conduct a de novo review to determine whether there is an adequate basis for imposing consecutive sentences; or (2) remand for the trial court to consider the requisite factors in determining whether to impose consecutive sentences." Id. at 864.

A trial court may order sentences to be served consecutively if it finds by a preponderance of the evidence that "[t]he defendant is sentenced for an offense committed while on probation[.]" Tenn. Code Ann. § 40-35-115(b)(6). In this case, the trial court noted when ordering consecutive sentences that the Appellant was on supervised probation for bribery of a witness and violation of a protection order at the time of the offense as shown by the presentence report. The Appellant's probation officer testified at trial. The record supports the trial court's finding that the Appellant was on probation at the time of the offense, and the trial court did not abuse its discretion by imposing consecutive sentences based on the Appellant's probation status. Accordingly, the Appellant is not entitled to relief.

**VII. Cumulative Error**. The Appellant argues that even if the alleged errors alone do not warrant relief, their cumulative effect deprived the Appellant of his right to a fair trial. The State responds that no errors occurred and even if they did, "there is no cumulative effect of such errors so great as to require reversal[.]" Though we concluded that the trial court erred by failing to provide a self-defense jury instruction and by admitting a life-in-being photograph, the cumulative effect of these two errors did not deprive the Appellant of his right to a fair trial.

The cumulative error doctrine recognizes that "there may be multiple errors committed in trial proceedings, each of which in isolation constitutes mere harmless error, but which when aggregated, have a cumulative effect on the proceedings so great as to require reversal in order to preserve a defendant's right to a fair trial." State v. Hester, 324 S.W.3d 1, 76 (Tenn. 2010). The doctrine applies when there has been more than one error committed in trial proceedings, but circumstances warranting a reversal are rare. Id. at 76-77; see also Gilliland, 22 S.W.3d at 273 (Tenn. 2000) ("Although the Constitution of our state and of the United States guarantees criminal defendants the right to a fair trial, neither guarantees criminal defendants the right to a perfect trial."). The Tennessee Supreme Court has provided the following guidance for assessing whether the aggregated errors deprived the defendant of a fair trial:

> A reviewing tribunal must consider each such claim against the background of the case as a whole, paying particular weight to factors such as the nature and number of the errors committed; their interrelationship, if any, and

combined effect; how the [trial] court dealt with the errors as they arose (including the efficacy—or lack of efficacy—of any remedial efforts); and the strength of the [State's] case. The run of the trial may also be important; a handful of miscues, in combination, may often pack a greater punch in a short trial than in a much longer trial.

Hester, 324 S.W.3d at 77 (quoting United States v. Sepulveda, 15 F.3d 1161, 1196 (1st Cir. 1993)).

The cumulative effect of the trial court's failure to provide a self-defense jury instruction and the admission of a life-in-being photograph was not so great as to require reversal. Given the strength of the State's case, we concluded that no reasonable jury would have accepted the Appellant's self-defense theory. This conclusion remains, even when considering the added prejudice of the life-in-being photograph. Accordingly, the Appellant is not entitled to relief under the cumulative error doctrine.

## CONCLUSION

Based on the above reasoning and authority, we find no reversible error and affirm the trial court's judgment.

_____
CAMILLE R. MCMULLEN, PRESIDING JUDGE